Good morning, Your Honors. May it please the Court. My name is Andrew Wyatt, and I represent the appellant, Michael Kronk. The trial court found that the private placement memorandum had adequate disclosures to essentially insulate the defendant from any type of liability. However, given the facts of this case, the statements that were made in alluring the investors, including Mr. Kronk, to the purchase of the investment, such as that some of the money was going to be used to purchase real estate, there was going to be monthly distributions, that it was a safe investment, the projections that at the end of 10 years the investment would be worth 426 percent. The fact that they have had a long history of 22 years where no client or investor has ever lost money, that there's 30 percent returns, all of these were inducements to purchase the investment. There were also nondisclosures that occurred at the time of purchase because of the fact that during the presentation, it was never mentioned of the fact that of the money that was going to be raised, 5.8 million was going to be used to purchase an existing business. Those facts were in the private placement memorandum, were they not? Yes, Your Honor. However, about 50 pages into the PPM, it discloses that. So one of the issues of the PPM Were they also set out in the subscription agreement? There is a subscription agreement. What we point out in our opening brief, Your Honor, is that that referred to a PPM dated January 3, 2005, as compared to the existing one, which is February 1, 2005. So if one was to take it literally, that's an issue, too, because it has to work both ways. If you're claiming that he received something, then they have to prove that there was a January 3, 2005 PPM. There was not. Mr. Wyatt, Judge Carney said that one of the deficiencies in the case that he saw from the plaintiff's standpoint was a failure of proof with regard to C enter, that you could not show any evidence that any individual defendant knew with regard to those forward-looking statements at the time they were made that they were false or that they were made in reckless disregard with whether they were true or false. Well, Your Honor, actually, we did provide the evidence for that, and in looking at that, there is a three-part test that the circuit has adopted. If I may find it. Anyway, the fact is that prior to this investment being offered, Land Wind was essentially a company that had six properties under its management, yielding approximately $300,000 to $360,000 a year. So to say that you were going to raise $20 million each year for four years, you have to have a basis for that, and also you have to disclose what that basis is to the investors. It wasn't until several years later, 2008, that the investors were given a letter that they actually were being relied on with Marshall Reddick to purchase or to raise the monies for these funds. I would also like to point out, Your Honor, with this companion appeal, there was Land Wind Partners 1, which they raised $20.5 million. That money was never, ever used for purchasing property. The only thing that was used was either lending to related... I thought the district court addressed that concern by saying that's all after the fact of the purchase, and you're alleging fraud in the sale of the security. So unless you can somehow show that that subsequent conduct can somehow relate back to established knowledge on the part of the defendants at the time of the offering, it's irrelevant to the question I asked you about the evidence of scienter as to each defendant. I understand, Your Honor. The reason why one of the standards is a conscious disregard or reckless disregard in terms of what information is available. At the time that they were offering this, with a company that had revenues of $300,000, to say that you're going to be raising four years $20 million, you have to have a basis, and they did not have a basis because if their whole basis is that somebody else has to do it, that fact should have been disclosed at the meetings. I mean, it should have been disclosed to the investors. We have to raise $20 million. For us to give you these type of returns, we have to raise $20 million every single year. And as I point out, I mean, it turns out that they did get some money, but they didn't use it. Now, I understand, Your Honor, it relates to other issues. However, if you look at a reasonable person standard in terms of, well, why do you think that? Why do you think that 426% return in 10 years? What is the base of that? It's pull it out of the sky and make it sound real good. Is there any evidence that you can point us to? There was a statement made that no client had ever lost money over, what, the 34 years of their business operation. Is there anything you can point to to show that that statement was knowingly false when made? Yes, I think it's particularly provable in the partner's case because my client purchased his share in February of 2007. By this time, Landwind Management was in operation for several years and losing money. It was, like, the next year that they came to the investors and asked for an additional $2 million. And they told them in advance. Wait a minute. That couldn't have misled him if he knew it. I'm sorry, Your Honor? If he was the person and he knew that, that wasn't going to mislead him. No, I'm saying we, my client found out about that in 2008 after he already purchased the Landwind Partner share. He would never have bought Landwind Partner if he knew this was happening. Oh, I see. So there, at least particularly for that case, it's very clear that at the time, and we also introduced an e-mail from, I believe it was Chris Parnas, that said that things are going great, we're still no, no.  About what, Your Honor? About the statement that our clients have never lost money. That I'm not sure because that was never, ever raised. It's a hundred and twenty-eight. It's in the PowerPoint presentation. It was in the PowerPoint. What I'm asking is whether there's something in the PPM that explains it, contradicts it, modifies it, or in any way. Well, one thing that contradicts is if on the PowerPoint presentation, you're saying this is a very safe investment, and in the PPM, you're saying you're going to lose your money a hundred percent. And that was one of the things that the judge mentioned is that, you know, what are you talking about? This was a risky investment. You knew you could lose a hundred percent. And my point to that, Your Honor, is yes. You know, any investment is risky. But the type of risk that you take for that is, okay, you said it was 426 percent. Maybe it was 200 percent. Okay, so it's less than that. You said you were going to buy $10 million of property. Okay, maybe you bought $5 million of property. Those are the kind of risks that you have. Maybe the thing devaluates. Those are acceptable type of risks. But when they take the money, and after the $5.8 million is taken off the top, in the case of the management case, you're left with $8 million. In a period of several years, a company that was generating 300,000 revenues now is burning at the rate of 120,000 a month. That's what their letter says. We're spending 120,000 a month. We're only earning 25,000 a month. What reasonable company does that? And what do you have to show for it? In our investigation, and we've presented, and I realize it's not related to the Tanbeek issue, but they have offices in five countries around the world. They have 12 properties in some competing management company that they started because the investors wouldn't give them the $2 million. I mean, whether in the inception, certainly I think in the case of the Partners case, it's clear because the management case is the proof that they were losing money at a time that they were saying that no one has ever lost money. In the case of the management, because of the private litigation regulations, we're not allowed to do discovery. So if we had done discovery, I think we would have found, and I do want to point out one thing, Your Honors, is that in the Partners case, they had to lend money from Partners to related entities of Mr. Landis because it was losing money. There was like a $1 million loan that was made, and there was also some properties that they bought into that were actually losing money. So their statements are clearly false and really unsubstantiated. So I know that this case right now is bogged down on the PPM, and it's really the first two cause of action. Well, it's bogged down on the PPM and on what the district court said was your inability, despite three opportunities to amend your complaint, to particularize the who, what, when, where, why, and how of Sienter. And that's kind of the state of the pleadings, right? Well, Your Honor, again, I did the best I could to try and give the court what they wanted, given the fact I couldn't do any discovery. But there's a lot of information available that you were able to garner. I provided. As a matter of fact, if anything, it was too voluminous. There was hundreds of paragraphs. There was documents that I attached as exhibits showing. I mean, in terms of false statements, you know, for example, and they get hung up on this registered business with the SEC. It should have been a registered. They said it wasn't, though, didn't they? They said it wasn't, and they said they had to write it down, too. And it was in the PPM as well as in the subscription agreement. Was that not true? What they don't disclose is that, by law, it should have been registered. It just wasn't. And in the case of the partners, they didn't even file the Form D. And I think that that's a material disclosure that should have been disclosed. Don't we have a legal problem with that? There's no private right of action to make a claim for the legal conclusion that the offering should have been registered. I understand that, Your Honor, but we are talking about disclosure and nondisclosure. That's true. If your client had bothered to read the PPM or the subscription agreement. Your Honor, there's a distinction between saying we didn't register because we think we were exempt and we didn't register even though we should have registered. And in the case of the partners, they didn't even file anything with the SEC. The question is how that's relevant to the cause of action under 10b.  But there's a lot of other causes of action that were also dismissed with prejudice. Which one is it relevant to? Why is it relevant? Which cause of action is it relevant to? Certainly to the misrepresentations. And we have deceit and concealment. There was concealment, so that would be relevant to that. Certainly to the unfair competition. But the district court dismissed all the state causes of action, didn't it, after its judgment on the federal causes of action? I'm sorry, I didn't quite understand. What happened to the federal, the state causes of action? They were all dismissed along. Lack of jurisdiction, i.e. he didn't exercise jurisdiction over them. That was related to the broker registry, Your Honor. But there was a number of the claims here that are on appeal that are state causes of action. Right. But we look at abuse of discretion in the district court's decision not to exercise supplemental jurisdiction over those claims once it has decided to dismiss all of the federal causes of action. I understand, Your Honor, but that wasn't the basis that the court found. It wasn't because it chose not to exercise supplemental jurisdiction. But ultimately did. Certainly as to some of the state law claims.  One cause of action. Can you help me on your attempt to convince us that a derivative claim can somehow be converted into a direct claim by a shareholder when no case so holds? Well, Your Honor, I did actually provide a number of cases in my brief regarding when it's a closed company and it's a small company. How many investors did we have here? In the first one, 211. 211. Yes. So that's a closely held company. It is a closely held company. By what standards? Yeah. By what standards is that a closely held company? Well, I guess, Your Honor, I interpret a closely held as being where it was not publicly sold. Any privately held company is closely held? Well, I understand there's a 35 investor restriction. So, okay. So if it's not a closely held company, then we're back to my derivative direct question. I understand, Your Honor. Certainly as to, let me make the argument for the breach of fiduciary duty. That wasn't the PPM that they had a duty. So that was a direct duty to the investor through the PPM. So it was contractual. It was contractual. So I would argue that that would also be, even though it's to the company, there's also an individual obligation of fiduciary duty. As to the RICO claim, I understand that that generally would belong to the company. However, in the case where the company chooses not to exercise, especially in a case like this, where the tortfeasors, the alleged tortfeasors are also all the management. Did your client bring a derivative suit? We brought a derivative suit in the state court, Your Honor. In the case on appeal here? No. No, Your Honor, I did not. Your Honor, I'd like to reserve my remaining time for rebuttal. Thank you. May it please the Court. I am going to address the issues in both of the matters on appeal. Can I just ask for clarification on a technical question? Did the district court dismiss all of the state causes of action ultimately, even though he had decided some of them, or only the ones that he had decided in favor of the plaintiff originally? Ultimately, the district court dismissed all the state causes of action. It dismissed all but one as part of the orders that are subject to appeal. Ultimately, he decided it wasn't going to exercise jurisdiction over them. It was one left. He would have had to have decided it. Once he had decided adversely in all of the federal causes of action. That's exactly right, Your Honor. Okay. So if we agreed with the state and the federal causes of action, there would be no reason for us to address any of the state causes of action. I would agree with that, Your Honor. Okay. What I was going to say is that counsel for Ms. Doretic is here as well, not planning to argue, unless the Court has questions of her. So I'll reserve a little time, just in case. Is Ms. Dean? It's actually someone in place of Ms. Dean. In place of Ms. Dean. Oh, okay. As the record makes clear, the district court went out of its way to give the plaintiff every opportunity to state viable claims, both for federal securities fraud, for blue sky cases, for common law claims as well. The order on the first amended complaint actually is quite explicit about what the plaintiff would need to do in order to remedy the deficiencies of his prior complaints. Counsel, what's your best language to point us to in the record, whether it's in the PPM or the subscription agreement, that is inconsistent with or bespeaks caution as to the expansive assurances of the PowerPoint presentations? In the land wind management supplemental excerpts of record, I would direct your honors to pages 110 and 111, which specifically have the same chart regarding projected returns, and say quite explicitly that those returns assume that $20 million is raised in each of the next four years by other entities to be formed for the purpose of investing in real estate. And does it then go on to say that's highly risky? Of course, it goes on to say it's highly risky. It says there's no guarantee the money might be raised. It says there's no guarantee that suitable investments might be identified. It goes on to say that, of course, the land wind management entity, and for that matter the fund wind entity, is a new business with no track record, and it goes on to say that the plaintiff could lose his entire investment. If, in fact, the statements made during the PowerPoint were misrepresentations, if, okay, and they're accompanied by go look at the PPM, does that wash out the misrepresentations if the PPM says otherwise? Well, I think yes in the following sense, because the plaintiff is still failing to adequately allege SIENTA, but more importantly the plaintiff has made an admission on reliance, which would defeat the representation even in your hypothetical. In both complaints, land wind management and Partners Fund 1. It's a fairly distressing construction of how the world is working here because one assumes that these PowerPoint presentations are being made the way they are because somebody thinks they are having some impact, i.e. because they know that people are likely to pay attention to them and likely to pay less attention to what's in this very voluminous manual. So if he could prove reliance, even if there were statements in the PPM, why wouldn't that suffice? Well, he can't prove reliance. I'll come back to your question, but he can't prove reliance because he says in both complaints that had the plaintiff known that the defendants were disclaiming everything as they do in the PPM, he would not have invested. That's an admission he makes in both complaints. And so he, in fact, he goes to the remarkable length of saying that the PPM is false and misleading. It sounds like he is stating reliance. Well, no, because he goes on to say that the PPM is false and misleading in that it contradicts the PowerPoint. So you have this turning things on its head. Well, that doesn't make a lot of sense. It doesn't make a lot of sense. The basic statement is I was relying on the PowerPoint. I wasn't relying on the PPM. And I understand the counterpoint to that is, well, he shouldn't have done that. He was told to go read the PPM. But nonetheless, if the PowerPoint was contradictory in an inflated way as a PPM, it's being made for a reason, specifically to induce reliance on it. The law in this circuit, Your Honor, is that you cannot rely on the PowerPoint in isolation, particularly when the same PowerPoint directs you to the PPM. The subscription agreement that you signed directs you to the PPM. No, no, no. Let's just say in PowerPoint we've already invested $500,000. Go read the PPM. You go to the PPM, the PPM says we haven't invested anything. And, therefore, you can't ‑‑ if you read past that somehow in the 100 pages of the PPM, you cannot rely on the PowerPoint, even if it was directly made and directly contradictory. But that's not this case. I understand. I'm asking you what if. If it was directly contradictory, and I think the court would have to look at whether the language of the PPM is sufficiently prominent and sufficiently clear that a reasonable investor would have been on notice that the statements in the PowerPoint were not statements he could rely on, is the answer to your hypothetical question. But that is not this case. No, they were obviously made to be relied on. They wouldn't have been made at all. They were made to be relied on, but the plaintiff himself admits that they are debunked by the PPM. And the plaintiff himself admits that had he been aware of the disclaimers in the PPM, he would not have invested. That admission necessarily, in my opinion, precludes reasonable reliance, because it then becomes a question of ‑‑ literally a question of whether or not he received the PPM. Counsel, perhaps I misunderstood what you just said, but can you help me understand why there's no inconsistency between your statement to us a minute ago that I understood to mean that there wasn't any direct contradiction between the PPM subscription agreement, slash between them, on the one hand, and the PowerPoint, and your statement just a minute ago that the PowerPoint was debunked by the PPM. How are those consistent? In the first instance, I was responding to the hypothetical. Okay. I don't believe there is any direct inconsistency. In fact, I think the PPM quite clearly explains, for example, the projections in the PowerPoint. But in answer to your second question ‑‑ I just wanted to be clear. Yes. I was literally quoting the plaintiff's judicial admission that the PPM contradicts the PowerPoint. If he says the PPM contradicts the PowerPoint and that had he known about the PPM, he would not have invested, there's simply no viable misrepresentation claim here. Okay. Well, then you're answering my hypothetical by saying that as long as it's in the PPM, it doesn't matter what they said. No. That's what you're saying. In fairness to your hypothetical, I don't agree that there is anything that contradicts. I understand that, but you're wandering the other direction. In fairness to your hypothetical, if there was a flat‑out contradiction between the two, I'll repeat my answer that you'd have to look at the language of the PPM. You just rely on the fact that he said there was a contradiction to prove that he loses. He does lose. I'm literally responding to your hypothetical, which is if there was a contradiction, there is not, and you would have to compare the language of the PPM, see how prominent it is, see if it matches up. I think you've got yourself a little bit of a contradiction yourself, but let's leave it alone for now. Okay. Can you respond? I just want a different point. Can you respond to the argument that counsel made that by the time the second investment is made, that there was evidence provided by the way the first investment had been handled that bears on the lack of or bears on the falsity of the PowerPoint used to sell the second investment and the statements contained in that PowerPoint? There's nothing in the record to indicate that money had been lost in land as of the 2006 date when the plaintiff, early 2006 date in which the plaintiff invested in Partners Fund 1. So the fullness of time hadn't provided evidence in the record from which an inference of knowing falsity could be made as to the second investment. That's correct. Is that your position? That's correct. And which one did he actually receive distributions on, the first or the second? Fund 1. Fund 1. Yes. How much did he receive, by the way? It wasn't clear to me in the record. I don't know how much it costs out to him individually. I think the distributions were something like 1% either annually or semi-annually. Fund 1 was the second one, is that right? Fund 1 is the second one. He still holds that. He still holds them both. Is there any information in the record on how much? I think there was something in the record about Fund 1 being, about the first fund being worth little. Do we have any information as to how much the second fund was worth? Yes, that is in the record. Fund 1 is worth more today than it was at the time that the plaintiff invested. Perhaps by way of explanation, Land Wind Management, as the name suggests, was set up to manage real estate investments that other entities were actually going to provide the funding to. And so unless and until those other entities were formed and unless and until those other entities were formed, there weren't going to be additional management contracts for Land Wind Management to capitalize on. Of course, what's really going on here, and this is in the record as well, is the timing of these investments was not particularly fortuitous, given the real estate market. In 2006, when Fund 1 was formed, it was not a particularly opportune time to be going out and making real estate investments, and so the managers did the conservative thing and actually conserved. I'm sorry? 2006 was a pretty good time. In 2006, the market was already dropping significantly, particularly in commercial real estate. So there were not good opportunities. The plaintiff was warned very clearly that no specific opportunities had been identified. None might, depending upon real estate circumstances. There's a real estate risk disclosure section in the PPM as well. On the subject of Sienter, the Court is absolutely right. There are, despite multiple opportunities, there are no non-conclusory allegations of Sienter. No facts allege that particular defendants, specific defendants, did not believe any of the forward-looking projections, particularly as qualified by the assumptions of the PPM at the time they were made. And certainly no facts showing intentional concealment of the PPM, since quite clearly the plaintiff was directed to the PPM on multiple occasions and explicitly acknowledged that he read and received it. On the issue of the state law claims, the Court quite correctly decided that he had stated no Blue Sky claim under 25-501 because he did not sue any direct seller. And the Court quite correctly decided that the RICO claim and the fiduciary breach claim could only be asserted as derivative claims. The district court also faulted the allegations for failure to say who made various representations. Does that matter, really? I think it does. The PSLRA specifically requires that you particularize. What if he just said one of these people? I'm not sure who it was, but it was one of these three people. I don't remember. I can tell you just the face. I don't know who they were. I don't believe that is sufficient. I believe the PSLRA quite clearly says that you That doesn't sound like a very intelligent rule. If he's quite clear that somebody speaking for the company said it and he's suing the company, he's not suing the people. Why would we have a rule like that? To make sure that you have What if he said there's somebody in a blue suit with blue eyes and red hair? He doesn't say that. If he were to say that an individual whose name I do not know or recall said X, Y, or Z, that's one thing. But to name ten defendants and not to identify who the speaker was with respect to any of the alleged misrepresentations clearly does not satisfy 9B of the PSLRA. He cites some group doctrine in his briefs. The group doctrine doesn't apply after the PSLRA and clearly is inappropriate here. Indeed, I noted in preparing for the argument that for the first time in his appeal brief, he claims that the PowerPoint misrepresentations were made by Mr. Dennison without identifying any other defendants. So the district court gave him a... But the PowerPoint is the PowerPoint. It's in there. So what's the difference who said it? Somebody said it. We know somebody said it. The difference is he's required to, under a controlling case law in the PSLRA, identify who said it, when they said it, what they said. This is an extrapolation of the requirements of 9B. If the Court has any other questions, I'm going to cede the time to counsel for Mr. Redeker. May it please the Court. Your Honors, my name is Amy Lewis. I'm here for Defendant Redek.  As I think the Court has already pointed out, the only element that's different with respect to Mr. Redek in the first, the management case, is the fact that he was sued for state causes of action of negligent and intentional interference with prospective business advantage. I'd like to point out that the arguments, I think Judge Hellman has correctly pointed out the fact that this is not a closely held corporation, that the causes of action are a derivative in nature. They're state causes of action. If, in fact, the Court decides that the Federal claims have no merit, then, in fact, the state claims are party to this case. So unless Your Honors have any questions, we're submitting. Thank you very much. Thank you. Thank you, Your Honors. To me, the interesting question of the case is the one I raised. Do you have any case law that supports what I understand? I mean, I understand your last position is you didn't have the PPM, but assuming that you did have the PPM because you were signed for it and so on, A, do you contend there are direct contradictions between the PowerPoint and the PPM and what are they? And, B, if there are and if the PPM would have corrected them, does that give rise to a cause of action? Okay. First off, yes, the PowerPoint clearly contradicts what's in the PPM. And one of the points I brought up was that they say it's a safe investment. Clearly that does contradict. Well, that's a little vague, but something specific. Well, okay.  They say it's a new business. They make it sound like they just rolled out of bed and they're starting a brand new business. But the fact is that they took $5.8 million out of this investment to pay someone supposedly for a valuable business that's been going on for 22 years. Didn't your client know these people? Didn't he know the background here? Didn't your client know the background here? No. No, he didn't. No. Okay. No, it wasn't until the PPM. And again, one of the things I'd like to point out that was in the first two complaints and then the change of language in the third complaint. The first two complaints, the paragraphs that the court was referring to, inferring that my client relied on the PPM, was just a subjective discussion that the PPM itself was a misleading document. It wasn't saying that my client relied on it, that he looked at it. So in the first, the- All right. But to go back to my earlier question. Sure. In terms of actual contradictions, both of those at a fair level of generalities, or anything specific, did it say are there numbers that were contradictory or factual statements that were contradictory, not omissions, but statements? Yes. The fact that there was going to be monthly distributions. I mean, this- I'm sorry to interrupt you, but you're making it sound as if there was a statement said that there will be monthly distributions. Wasn't it clear that these were projections? Well, it said it in the PPM. It didn't say possible monthly distributions. It said there will be monthly distributions. It said that these were projections. Yes. And it also said that they were going to invest in real estate, that a portion of the proceeds were going into real estate. And contrary to what counsel is saying, we just went into a period where price of property was dropping dramatically. And if you waited long enough, you could pick up bargains. They could have scooped up a lot of real estate that today would be really valuable. So this argument of saying, well, it was a bad market, I understand if you're a seller, it's a bad market. But if you're a buyer, it's a great market. So that argument doesn't fly. And one thing I was going to point out, Your Honor, is that- How is that responsive to the question of direct contradictions? I'm sorry? Your Honor, I'm just responding to counsel's comment. Thank you. So far, it doesn't seem like there was a direct contradiction. The PPM? And what's in the- Well, there certainly were generalities. I agree with that, Your Honor. However, it was used to induce into the investment. And it did talk about high returns. And I believe that in the PPM, it actually talks about the- I'm sorry, in the PowerPoint presentation, it talks about the 429 percent return on investment. Those were all projections. What I was looking for was a contradiction in historical fact. Well, again, Your Honor, part of the problem that we had in this case is that we weren't allowed to do any kind of discovery. So we had to go on what was available. That's between the PPM and the PowerPoint. Okay. The PPM, let me just say that in terms of nondisclosures, there was a lot that was in the PPM that was never brought up in the presentation, such as the $5.8 million, such as the finder's fee that goes to Mr. Reddick and others, such as that they were going to be using the money for infrastructure and things like that. They made it sound like this money was going to be used to buy real estate. So there are-this case is more about omissions, Your Honor, than necessarily misrepresentations. But there is also the misrepresentations as well. And also I'd like to point out, Your Honor, because the counsel was talking about the PSLRA 9b standard, and that's true. That applies to the first two causes of action. All the rest of the claims are not part of that and therefore are under the Rule 8 standard. It's more liberalized. Which ones? RICO? What else? Well, the misrepresentations, the- Those are, again, our state causes of action that go away if the federal ones don't stand up. I understand. I understand. I'm sorry. What was the question? Well, I wanted to know what federal cause of action other-isn't subject to 9b. Other than the RICO? RICO. RICO would be. And RICO is not covered by 9b even though-isn't it-is the predicate act related to the securities? Well, Your Honor, arguably, and I know there's an issue regarding whether it's derivative or a direct claim, but one of the points that I brought up in the brief was that in 2009 when Mr. Dennison left the company and was given $500,000, they reformed the shares for Mr. Landis, and as a result he went from a 40 percent stake in the company with Glenwin Group to a 51 percent stake, and the investors got nothing for that. But your predicate acts in the RICO claim would have to be mail-in wire fraud, would they not? Yeah, well, that again, Your Honor, would- Or fraud claims subject to 9b. Okay. Understood. All right. Your time is up. Thank you both for your argument. Thank you, Your Honor. I appreciate it. The cases of Kronk v. Landwin Group are dismissed.
judges: Rosenthal, Berzon, Tallman